**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISON**

| | |
|---|---|
| **RETROLED COMPONENTS, LLC,** §<br>*Plaintiff / Counterclaim-Defendant,* §<br>§<br>**v.** §<br>§<br>**PRINCIPAL LIGHTING GROUP, LLC,** §<br>*Defendant / Counterclaim-Plaintiff,* §<br>§<br>**v.** §<br>§<br>**PRINCIPAL LIGHTING GROUP, LLC,** §<br>*Third Party Plaintiff / Third Party* §<br>*Counterclaim-Defendant,* §<br>§<br>**v.** §<br>§<br>**REECE SUPPLY COMPANY OF DALLAS,** §<br>*Third Party Defendant / Third Party* §<br>*Counterclaim-Plaintiff.* §<br>§ | **Civil Case No.: 6:18-cv-55-ADA**<br><br>**JURY TRIAL DEMANDED** |

**EXHIBIT H**

**TO**

**THE DECLARATION OF JOHN M. BUSTAMANTE
IN SUPPORT OF**

**RETROLED COMPONENTS, LLC AND REECE SUPPLY COMPANY OF DALLAS'S
MOTION TO EXCLUDE THE OPINION TESTIMONY OF
MR. MICHAEL GERSHOWITZ AND MS. CANDICE K. Q. CORNELIUS**

---

**Case No. 0:08-cv-04960-JRT-FLN (Dkt. No. 135)**

**MARCH 31, 2011 MEMORANDUM OPINION AND ORDER ON DEFENDANTS'
MOTIONS TO EXCLUDE EXPERT TESTIMONY OF CHRISTOPHER LAMPE,
ARTHUR ERDMAN, AND JULIE DAVIS**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES CO. and 3M CO., | Civil No. 08-4960 (JRT/FLN) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY OF CHRISTOPHER LAMPE, ARTHUR ERDMAN, AND JULIE DAVIS** |
| v. | |
| LOUIS M. GERSON CO., INC. and GERSON PROFESSIONAL PRODUCTS, INC., | |
| Defendants. | |

David J. F. Gross, Theodore M. Budd, and Jeya Paul, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402-3901, for plaintiffs.

John A. Cotter and Thomas J. Oppold, **LARKIN HOFFMAN DALY & LINDGREN LTD.**, 7900 Xerxes Avenue South, Suite 1500, Minneapolis, MN 55431-1194, for defendants.

Defendants Louis M. Gerson Co., Inc. and Gerson Professional Products, Inc. (collectively, "Gerson") seek to exclude the testimony of plaintiffs 3M Innovative Properties Company and 3M Company's (collectively, "3M") expert witnesses Christopher Lampe, Arthur Erdman, and Julie Davis. Because all three witnesses utilize reliable methodologies applied to sufficient facts, the motions are denied except as to limited portions of the challenged witnesses' testimony.

# BACKGROUND

The instant motions to exclude expert testimony focus on a 3M invention for a paint spray gun reservoir that allows for the mixing of paint in a container that can be attached directly to a spray gun for painting, and then efficiently and cleanly removed. 3M's invention is patented and recognized by U.S. Patent No. 7,374,111 (the '111 Patent), which is related to several other patents, including U.S. Patent No. 6,820,824 (the '824 Patent). 3M developed a line of paint preparation system, marketed as 3M's Paint Preparation System ("PPS"), which embodies the invention of the '111 Patent.

Gerson markets the Gerson Paint System ("GPS") which uses also spray gun reservoirs. On August 19, 2008, 3M brought this action against Gerson alleging that Gerson is infringing the '111 Patent by using, actively inducing others to use, contributing to the use of, and selling, the GPS. (Compl., Docket No. 1.)

In its motions Gerson argues that: Christopher Lampe's expert testimony should be excluded because aspects of his testimony are unreliable, and he is not qualified to comment on secondary considerations of non-obviousness; Dr. Erdman's testimony should be excluded because his expertise is in bio-medical engineering as opposed to paint-spray systems; and Julie Davis' opinions should be excluded as lacking a reliable basis and improper application of methodology. For the reasons set forth below, the Court denies Gerson's motion as to Davis and denies in part and grants in part the motions as to Lampe and Erdman

# DISCUSSION

## I.   STANDARD OF REVIEW

Admissibility is a procedural issue not unique to patent law, therefore in patent cases admissibility of evidence is governed by the law of the regional circuit, here the Eighth Circuit. *See Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1391 (Fed. Cir. 2003). In the Eighth Circuit, Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and such testimony is admissible if three prerequisites are met. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* Second, the proposed witness must be qualified. *Id.* Third the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *Id.*

With regard to the third prong, Rule 702 prescribes that evidence is reliable or trustworthy if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597-98 (1993). The proponent of expert testimony has the burden to show by a preponderance of the evidence that expert testimony is admissible under Rule 702. *Lauzon*, 270 F.3d at 686; *see also Daubert*, 509 U.S. at 592. However, "[t]he rule clearly

is one of admissibility rather than exclusion." *Lauzon*, 270 F.3d at 686 (internal quotation marks omitted). Expert testimony is admissible if it "rests on a reliable foundation and is relevant to the task at hand." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100-01 (8th Cir. 2006) (citation and quotation marks omitted). "The facts or data in the particular case upon which an expert bases an opinion . . . may be those perceived by or made known to the expert at or before the hearing." Fed. R. Evid. 703

Reliable expert testimony can be based on specific experience, or academic or scientific foundations. *Schmidt v. City of Bella Villa*, 557 F. 3d 564, 571 (8th Cir. 2009) ("[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion."); *Kumho*, 526 U.S. 150 ("Engineering testimony rests upon scientific foundations . . . .") Thus, depending on the purpose of an expert's testimony, explicit scientific or academic credentials may not be necessary, and experience along with reliable facts can serve as the foundation of an expert's opinion. *See Schmidt*, 557 F.3d at 571.

## II. CHRISTOPHER A. LAMPE

Christopher A. Lampe earned a Bachelor of Arts degree with a Geography Environmental Emphasis from the University of Northern Iowa in 1999. Lampe has authored research papers on spray painting and coating technology, and has worked as an

instructor at the Iowa Waste Reduction Center ("IWRC"), affiliated with the University of Northern Iowa, as a "Process Research/Reduction/Education Specialist" for the past ten years. Lampe became an instructor in IWRC's Spray Technique and Research ("STAR") program in 2000, providing training on spray gun painting to community college instructors, plant managers, supervisors, and automotive painters. Lampe has also been involved with the Center's Spray Technique Analysis and Research for Defense Air Force ("STAR4DAF") program, creating three training modules for an Air Force spray painters training course. Lampe also conducts waste audits. Due to his involvement with the STAR programs, 60-70 percent of the audits assigned to Lampe involve automobile spray painting. Until 2006, he made approximately four or five visits a month to automotive body shops for audits. Since 2006 Lampe makes approximately one visit per month to automotive body shops.

To facilitate his investigation, Lampe purchased a GPS kit and followed the enclosed instructions. "My first reaction [to viewing the GPS product] . . . was that the GPS product appeared nearly identical in form and function to the PPS product." (*Id.* at 16.) Lampe describes the use of the GPS product as follows:

> [T]he GPS product includes a mixing cup, a liner, a lid, and a ring. Like the [PPS], the GPS product, the mixing cup, liner, and lid of the GPS product are assembled to form a reservoir which can hold paint . . . Like the [PPS], the GPS product has an integrated filter. Like the [PPS], the lid of the GPS product includes an opening which can connect to a spray gun and which can be capped off for storage.

(Lampe Expert Rep. at 16, Paul Decl. Ex. 24, Docket No. 105.) Lampe then states "[i]n my opinion, the steps I took when using the GPS product . . . match the steps in the

claims of the '111 Patent." (*Id.*) Lampe provides that "based on his years of experience using spray guns and teaching the use of spray guns, it is [his] opinion that there is no substantial use of the GPS product that would vary from the use described above [of the PPS product]." (*Id.* at 19.)

Lampe then discusses his opinions related to the objective evidence of nonobviousness. He details two conclusions from his analysis: (1) the objective evidence supports a finding that the claimed invention would not have been obvious to one of ordinary skill; and (2) there is a strong connection between the objective evidence and the claimed invention. Lampe then evaluates the five secondary factors of nonobviousness. He says that the 3M product has enjoyed "tremendous commercial success," and that he understands that 3M's sales have "grown steadily since the introduction of the PPS in 2001." (*Id.* at 20.) In his "opinion, the success of 3M's PPS product is due to the claimed invention of the '111 Patent. [His] experience indicates that painters prefer to use the PPS product over traditional spray gun cups" because of the efficiency of using one container to mix and spray materials, and because it can be used from any angle. (*Id.* at 21.)

Lampe states that the PPS product fulfills a long-felt but unsolved need because it streamlines and simplifies a messy, environmentally harmful process. Lampe testified it is his understanding that Gerson and Illinois Tool Works, competitors of 3M in the spray gun market, released nearly identical products after 3M's introduction of the PPS to the market. Lampe further opines that he was initially skeptical about the product when introduced to it in 2001, but that "[a]ny initial hesitation [he] experienced . . . quickly

disappeared.  [He has] never experienced any performance issues with the PPS product . .

. and it performs better than [he] expected."  (*Id.* at 26.)  Finally, Lampe says that he is

aware of the awards and praise for the PPS product, and it is his opinion that the

recognition is a result of the invention claimed by the '111 Patent.

### A.       Admissibility of Lampe's Opinions

#### 1.       Understanding of Patent Law

Lampe sets forth his understanding of patent law in Section V of his report.

Because the Court is the source of law in a patent case, Lampe cannot testify as to his

interpretation or explanation of patent law.  *United States v. Wells*, 63 F.3d 745, 753 (8th

Cir. 1995), *vacated and remanded on other grounds*, 519 U.S. 482 (1997).

#### 2.       Relevance and Reliability

Gerson argues that Lampe offers no foundation for his opinion or understanding

that a painter using the PPS product follows the claimed method of the '111 Patent.

Gerson essentially argues that Lampe only bases his opinions on an "understanding"

derived from what 3M's attorneys told him.  Gerson also challenges Lampe's reliability,

and the relevance of his testimony on his own use of the PPS, arguing that "the use of the

PPS product is not an issue in this matter . . . . It is well-established that 'infringement is

not determined by comparison between commercial products.'"  (Def.'s Mot. to Exclude

Lampe at 11, Docket No. 93) (quoting *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476,

1481-82 (Fed. Cir. 1984) (internal alterations omitted).)

Lampe's extensive experience with the PPS product, his years of teaching spray gun painting, and his own use and examination of the GPS product all provide a reliable basis for formulating an opinion in this matter.  *See* Fed. R. Evid. 703.

## B.    Secondary Considerations of Nonobviousness

### 1.    Qualifications and Sound Basis for Opinions on Secondary Considerations of Obviousness

Gerson argues that Lampe is not qualified to opine on secondary considerations of nonobviousness because he has spent only limited time in auto body shops recently, and mostly instructs military painters on processes for improving painting efficiency.

Lampe has used, and has trained others to use, the PPS system over many years which provides a sound basis for his opinions.  *See Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 283 (8th Cir. 1995).  Further, Lampe's opinions are specifically related to the **reasons** for the success of the PPS product, which requires a knowledge of the product's characteristics and virtues, and how those characteristics contribute to the financial success of 3M's embodiment of the '111 Patent.  Thus, the Court finds Lampe qualified to opine on secondary considerations of nonobviousness.

"Secondary considerations [such] as commercial success, long felt but unsolved needs, failure of others . . . might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented and may have relevancy as indicia of obviousness."  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)) (internal alternations and quotation marks omitted).

In his expert report, Lampe states:

[I]t is my opinion that the objective indications of nonobviousness support a finding that the claims of the '111 Patent would not have been obvious to one of ordinary skill in the relevant art . . . . 3M's PPS product, which is used according to the claimed method, has been a commercial success, received numerous awards, and been copied by two competitors. It has also met a long-felt need to increase the efficiency and safety in the spray gun industry. In addition, it is my opinion that there is a strong connection between the objective evidence of nonobviousness and the claimed method of the '111 Patent.

(Lampe Rep. 20-21.) Gerson claims that these subjects are outside Lampe's area of expertise and he does not provide any reliable factual bases for his conclusions.

### a. Commercial Success

Gerson argues that Lampe does not have sales expertise, and did not conduct an analysis or survey about the success of the PPS product, thus his testimony cannot be considered "expert" and should be excluded. 3M argues that Lampe is not actually opining on the sales or marketing numbers themselves, Lampe is instead relating his opinion on the **reasons** for the success of the 3M product, which he explains is a result of the '111 Patent.

Lampe has trained many people in spray gun painting, and through his inspections and audit work is in a position to understand what products are typically used for painting and why. The Court finds Lampe's opinion admissible on commercial success provided his opinion is confined to the reasons for the success of the product, and not to the **fact** of its commercial success.

### b. Long-Felt Need and Failure of Others to Find a Solution

Lampe reports there was a "long-felt and un-met need for a method that simplified the paint preparation process and reduced the amount of time, effort, and solvent used to clean a spray gun." (Lampe Rep. at 23.) Experts are allowed to testify from personal knowledge and experience so long as the experience bears a close relationship to the opinion. *See Sylla-Sawdon*, 47 F.3d at 283. One of Gerson's experts, David Pulsifer, suggests there were no products before the PPS that combined all the steps of the paint preparation, spraying, storage, and disposal process into a single container. (Dep. of David Pulsifer ("Pulsifer Dep.") 325:9-12, Feb. 23, 2010, Paul Decl. Ex. 41, Docket No. 105.)

Lampe's experience placed him in a position to know the needs of the spray gun industry, and in addition, in a position to know what products met, or failed to meet, that need. The Court determines that Lampe's testimony relating to long-felt need is admissible.

### c. Others Infringed or Copied

"'An infringement analysis entails two steps. The first is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device [or process] accused of infringing.'" *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668-69 (Fed. Cir. 2000) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)).

Regarding copying by competitors, Lampe states:

> The original Gerson product [and] the current Gerson product . . . include the same four primary components as the PPS product . . . . Any differences between the [GPS] and the PPS product appear to be superficial and not directed to differentiating the products in terms of operation . . . . I do not see any substantial differences between the current GPS product and the PPS product in terms of function or operation.

(Lampe Rep. at 24-25.)

Gerson argues that Lampe did not follow this approach with a limitation-by-limitation analysis, thus his report cannot be helpful to a trier of fact. Further, Gerson argues that Lampe has not provided an explanation of how he concluded there were no substantial differences between the systems. Though Lampe did not follow the limitation-by-limitation approach, he specifically noted that the products each use "the same four primary components," and determined that whatever differences did exist between the two were superficial. Lampe's statement cannot be considered an infringement analysis, particularly because he compared the two products with each other, rather than the allegedly infringing product against the properly construed claim language. However, his years of experience with paint systems, and his experience with the GPS product, could be useful to a trier of fact as part of a broader argument regarding infringement or the lack thereof. Thus, the Court finds Lampe's testimony admissible because although he did not follow a limitation-by-limitation approach to the analysis, such a deficiency is best challenged by cross-examination as to Lampe's thoroughness and the purpose of his analysis. Fed. R. Evid. 702.

### d.    Unexpected Results and Awards

Finally, Gerson argues that Lampe should not be allowed to present evidence on the unexpected benefits of the PPS system, or on the awards that the PPS system has received because any information he has on those issues is anecdotal.  Similarly, Gerson says that Lampe's "expert opinion" about 3M's awards are allegations of fact which a jury is equally capable of interpreting.

The Court finds Lampe's opinions on the unanticipated benefits of the PPS system admissible because he teaches and uses the system and thus he has the experience necessary to convey his observations as to the benefits of the system.  However the Court will limit his testimony as awards 3M has received.  The Court agrees with Gerson that such awards need not be introduced by expert testimony.

In sum, the Court denies Gerson's motion to exclude the testimony of Christopher Lampe, as he is qualified to provide an opinion on the use and secondary considerations of nonobviousness of the '111 Patent.  However, the Court limits Lampe's report in so far as it states an understanding of patent law or discusses awards 3M has received.

## III.    ARTHUR G. ERDMAN

Dr. Erdman obtained a B.S. in mechanical engineering from Rutgers University in 1967, and an M.S. and Ph.D. in mechanical engineering from the Rensselaer Polytechnic Institute in 1968 and 1971 respectively.   He is the Director of the University of Minnesota's Medical Devices Center.  Erdman teaches, conducts research, and publishes in the area of mechanical design.  Erdman teaches a "new product design and business

development course" at the University of Minnesota which has involved some paint technologies. Erdman has consulted for companies that design and manufacture paint spraying equipment. He has served as an expert in paint-related products litigation, for instance in a 3M patent case against Illinois Tool Works ("ITW") involving a patent in the '111 Patent family. During his investigation for that case he received demonstrations and experienced spraying the PPS product. Erdman has testified as an expert regarding the mechanical design of products approximately thirty times.

To reach his opinions in this case, Erdman reviewed the '111 Patent and prosecution history, the cited prior art, discovery responses, the infringement and non-infringement claim charts, the claim construction materials, and prior art statements, over the course of approximately 120 hours. He also reviewed Lampe's expert report. Erdman met with Steve Joseph, one of the '111 Patent's inventors, and with John Escoto, another 3M employee knowledgeable about paint spraying technology.

With regard to the GPS, Erdman examined physical samples of the GPS products, the use instruction sheets Gerson encloses with the GPS kit, and watched a 3M video used to train sales representatives on the GPS and PPS products. Erdman also walked through the processes of assembling and spraying liquid using the GPS product.

Erdman addressed claim construction by discussing the parties' proposed constructions applying the plain and ordinary meaning of the claim language, because at

the time the report was written the Court had not yet ruled on claim construction.[1] Erdman determined that use of the GPS satisfies the claim language for each limitation.

Erdman assessed the relevant prior art references, concluding that none of the prior art references relied on by Gerson anticipate or render the '111 Patent obvious as claimed by Gerson.

### A.     Admissibility of Erdman's Opinions

#### 1.     Qualifications to Provide an Opinion on the Relevant Field of Art

Gerson first argues that Erdman is not competent to render an opinion on the relevant field of art, because he is an expert in the mechanical design of biomedical devices, not paint spraying systems.  Gerson asserts that the fact that Erdman is a professor and a mechanical engineer is not in itself sufficient to substantiate what Gerson characterizes as Erdman's overly broad and unsubstantiated opinions.  *See Shaffer v. Amamda Am., Inc.*, 335 F. Supp. 2d 992, 996 (E.D. Mo. 2003) (finding that proposed expert's testimony cannot survive *Daubert* challenge when the expert lacked a comprehensive understanding of how a machine he was opining on worked).

An expert need not have specialized knowledge if he is generally qualified on the topic and can bring to bear knowledge of the principles necessary to assist a jury in understanding an issue.  *Robinson*, 447 F.3d at 1100-01 (finding that though a medical expert was a neurologist and the problem was orthopedic, his opinion about the onset of

---

[1] The Court's order on claim construction determined that the plain and ordinary meaning of the claim language applies.  (Order, Docket No. 123.)

pain was within his realm of expertise as a neurologist and was admissible); *Sylla-Sawdon*, 47 F.3d at 283 ("[A]n individual can qualify as an expert where he possesses sufficient knowledge gained from **practical experience**, even though he may lack academic qualifications in the particular field of expertise." (emphasis added)).

Erdman's background as a professor of mechanical engineering certainly qualifies him to opine on various aspects of the mechanical functioning and design of a product, and his previous experience with some aspects of paint-spraying technology further supports that he is qualified to offer his opinions in this case. Thus the Court finds Erdman qualified to provide an expert opinion on the relevant field of art.

### 2.  Person of Ordinary Skill

The parties' experts contest the relevant qualifications of one having ordinary skill in the art, which is a factual determination. Erdman's definition of a person with ordinary skill in the art is someone who either "[has] a bachelor's degree in mechanical or industrial engineering . . . and a few years of product design experience . . . [or, alternately has] one year of experience in designing, developing, or engineering paint spray equipment and/or the components thereof." (Erdman Rep. at 32.) Gerson argues that an expert providing a definition of a person of ordinary skill in the art should consider the educational level of the inventor, the type of problems encountered in the art, prior art, rapidity of innovation, sophistication of the technology, and educational level of active workers in the field. *See Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

*Daiichi* specifically states that the list of factors to be considered by an expert regarding ordinary skill in the art is not exhaustive. *Daiichi*, 501 F.3d at 1256. Despite Erdman's lack of specificity, his extensive experience in mechanical design, engineering, and the training of other engineers allows him to opine on what qualifications a person of ordinary skill in his field (mechanical design) would have. Further, Erdman has included in his definition several of the *Daiichi* factors, including the level of education (at least a bachelor's degree), the type of work experience necessary (experience in engineering paint spray equipment), and the timeframe in which the person worked (at least one year of design). Thus, the Court will allow Erdman's definition of "person of ordinary skill in the art" to be presented at trial and challenged on cross-examination.

### 3. Literal Infringement and Infringement under the Doctrine of Equivalents

An infringement analysis comprises two steps, as described above. *Markman*, 52 F.3d at 976. Gerson argues that Erdman's conclusion that the GPS infringes claim 1 of the '111 Patent is improper because it proffers opinions as to definitions of claim language the parties have not put in issue. The Court considers Erdman's opinions on the claim limitations admissible because Erdman was setting a baseline against which he offered his opinions, not offering a manner in which the Court should construe claims.

Evidence of equivalents must be "presented to the jury or other fact-finder through the particularized testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and

establishes that those skilled in the art would recognize the equivalents." *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir. 2007).

Erdman has not provided a limitation-by-limitation description of how a person of ordinary skill in the art would recognize the equivalents, thus the Court finds Erdman's analysis of infringement under the doctrine of equivalents too generalized and thus unhelpful. *Id.* There is no particularized testimony as to how the products are equivalent, instead, Erdman simply says that "the GPS lid engages the liner such that a user may lift the liner from the outer container together with the lid." Thus, the Court will limit Erdman's testimony as to any analysis under the doctrine of equivalents. However, this limitation is not sufficient to exclude any other part of Erdman's report or testimony.

### 4. Commercial Awards

Gerson seeks to exclude Erdman's "opinion" concerning 3M's awards for the PPS system because Erdman did not personally review the materials to determine **why** the awards were received – whether they were for the process, or the product. In the absence of analysis by Erdman suggesting specifically why 3M's awards demonstrate infringement, the Court will exclude Erdman's testimony about any commercial awards received by 3M for the PPS product, as irrelevant. The jury is capable of interpreting the awards to the same extent as Erdman.

### 5. Second Report

Erdman's second report opines that the claims of the '111 Patent are neither anticipated nor rendered obvious in the manner discussed by Gerson in its prior art

statement. (Second Erdman Rep. at 40.) Gerson argues the second report should be excluded because Gerson is not asserting anticipation as grounds for invalidity (which Erdman addresses), and because Erdman did not consider the full prosecution history of the '111 Patent. To the extent that Erdman did not review **all** of Gerson's prior art arguments, the appropriate challenge is to weight, not admissibility. Erdman reviewed the relevant prior art, and his opinions on anticipation and invalidity are relevant as to some arguments made by Gerson on those topics.

The Court denies Gerson's motion to exclude the report and expert testimony of Arthur Erdman, as he is qualified to provide an opinion on the potential infringement by the GPS product, the use of the PPS product, and definitions of "relevant field of art" and "person of ordinary skill." However, the Court will limit Erdman's report in so far as it states an understanding of patent law or states any opinion about awards 3M has received.

## IV.   JULIE L. DAVIS

Julie L. Davis has provided audit and financial consulting services to attorneys and corporate clients for more than thirty-one years. Davis graduated from Kansas State University in 1978 with a Bachelor of Science degree in Business Administration and Accounting. Davis is a member of the American Institute of Certified Public Accountants, the American Bar Association, and the Licensing Executives Society. Davis has testified as a damages expert in more than one hundred and fifty patent

infringement cases since 1994. Davis is currently a Principal at Davis & Hosfield Consulting LLC.

Davis was asked to prepare analyses regarding the damages recoverable by 3M should Gerson be found liable for the claims 3M is asserting. She relied on the documents produced by the parties, deposition transcripts of, among others, Ronald Gerson, Christopher Nazar, and Thomas Nicolosi, and sales and marketing data from Gerson and 3M. Davis' opinions concerning the market are partly based on discussions she had with Michael Howcroft ("Howcroft"), Business Manager for 3M's Paint Applications Systems, and Brian Shafer, Marketing Manager for 3M's Automotive Aftermarkets Division.

Davis points to four factors that must be shown to obtain an award of lost profits: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit demand; and (4) amount of profit that the patentee would have made absent the infringement. *Panduit v. Stahlin Bros. Fiber Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978); *see also Global Traffic Techs. v. Tomar Elecs.*, Civ. No. 05-756, 2008 WL 6397825, at *1 (D. Minn. Oct. 1, 2008).

Davis discusses demand for the product incorporating the patented invention, and states that such demand can be demonstrated by showing significant sales or use of products incorporating the patented invention. Davis next discusses the absence of acceptable non-infringing substitutes, noting two disposable paint application systems that compete with 3M's patented product: the DeVilbiss De Kups paint system produced by ITW, and the SATA Rapid Preparation System. She notes that the DeKups product is

sold under a 3M license, and that while the products may be acceptable non-infringing substitutes, there may be significant differences between the ITW and SATA products and the 3M product.  Davis notes that she has adjusted her calculation of market share in accordance with the standards set by *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577-78 (Fed. Cir. 1989).  Specifically, she accounted for the possibility that the paint application systems offered by DeVilbiss and SATA would be acceptable and non-infringing.

Davis learned through Howcroft that 3M believes the disposable paint cup market to be divided such that 3M has an 83 percent market share, while DeVilbiss, SATA, and Gerson have market shares of 10, 5, and 2 percent, respectively.  Davis reports that these estimates are generally consistent with the estimates of Ronald Gerson "who believed that within the market for disposable paint systems, 3M holds a market share of about 90-95%, while DeVilbiss has 5%." (Dep. of Ronald Gerson ("Gerson Dep.") at 92:22-93:5, Aug. 20, 2009, Paul Decl. Ex. 42, Docket No. 105.)

The main point of Davis' report is her calculation of the lost profits experienced by 3M due to Gerson's sales of allegedly infringing GPS products.  Davis sets forth several assumptions she makes about the data including that 3M would have made the "but for" sales at the same average price at which it actually sold its own PPS products, though she is aware that the average selling price of Gerson's products is lower.  Davis concludes that 3M will be able to prove that it lost profits for the period from the date of the '111 Patent issuance through August 25, 2009 of $1,299,971 due to Gerson's alleged infringement.

**A.    Admissibility of Davis' Opinions**

**1.    Market Testimony**

Davis' report sets forth a definition of the relevant market, which she understands to be "the disposable paint cup market, [which is a segment of] the paint spraying and mixing market."  (Davis Rep. at 5.)  Davis' basis for this opinion is a discussion with Michael Howcroft.  Davis also stated "I **do** have expertise as it relates to evaluating the factors related to marketing for purposes of a damages analysis."  (Dep. of Julie L. Davis ("Davis Dep.") at 16:1-4, Feb. 12, 2010, Paul Decl. Ex. 36, Docket No. 105) (emphasis added).  Davis says she arrived at her opinion of the relevant market based on testimony and interviews with both Gerson and 3M employees.

Gerson complains that Davis is an accountant by training, not a marketing expert, did not perform an independent investigation to inform her opinion, and did not seek to compile an exhaustive list of every product that uses a disposable paint cup.  As such, Gerson argues that Davis' market testimony should be excluded since she is not qualified to render an opinion about what constitutes the market for disposable paint cups.  The Court finds that Davis' background in accounting, research to form opinions in this case, and her experience testifying as a damages expert in patent litigation, suggest she is qualified to opine on the definition of a relevant market.

"To show 'but for' causation and entitlement to lost profits, a patentee must reconstruct the market to show hypothetically likely outcomes with infringement factored out of the economic picture.  Such market reconstruction, though hypothetical, requires

sound economic proof of the nature of the market." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l*, 246 F.3d 1336, 1355 (Fed. Cir. 2001) (internal citation and quotation marks omitted). Gerson argues that Davis' report was not based on "sound economic proof of the nature of the market," thus her analysis does not follow the principles and methods required to determine a market in a patent case.

To determine the relevant market, Davis spoke with Howcroft, 3M's Business Manager for Paint Application Systems, about other products in the market. She testified that she is aware of two disposable paint application systems that compete with 3M's patented product and could be deemed non-infringing: the DeVilbiss Dekups paint system, and the SATA system. Davis also discusses price differences, noting that the average selling price of Gerson's products is generally less than the corresponding product that would have been sold by 3M." (Davis Rep. at 14.)

The primary focus of Gerson's challenge is that Davis' definition and analysis of the market came from employees of 3M. Though partially accurate, Davis nonetheless refers to the testimony of Gerson, Nicolosi, and others who were not 3M employees, throughout her report. Davis' report may be lacking in clearly defined "sound economic principles," however because there is no industry wide survey or analysis of the market, and because Davis spoke with employees of both parties who were largely in agreement about the state of the market, Davis' testimony is not the product of an unreliable methodology. Davis' previous experience analyzing and testifying about patent markets, coupled with her review of the testimony and documents, constitutes a reliable

methodology on which to base her opinions. The fact that the bases of her opinions were formulated in part by discussions with 3M employees goes to weight, not admissibility.

### 2. Market Share

Gerson argues that Davis' opinions regarding market share are based on unreliable and insufficient facts. Here, Gerson confuses "the requirement for sufficient facts and data with the necessity for a reliable foundation in principles and method, and end[s] up complaining that [Davis'] testimony was not based on reliable facts." *Micro Chem. Inc.*, 317 F.3d at 1392-93 (quotation marks omitted). In *Micro Chem*, the Federal Circuit found that even when a damages expert may have based his opinion on inaccurate facts because he relied on the statements of others, and did not undertake an independent investigation, his testimony was admissible. *Id.* ("[T]he trial court properly did not rule inadmissible [the expert's] testimony simply because it was based on [plaintiff's] version of the contested facts.").

Davis concluded from her interviews that although there may be products other than the GPS, DeVilbiss, and DeKups products for a GPS customer to turn to, Nicolosi, Shafer, and Howcroft did not believe that those products were significant in the market. (Davis Dep. at 63:20-65:24.) Howcroft is the Business Manager for the relevant division of 3M, and has been responsible for the PPS product sales and marketing. He oversees a team of over 200 sales representatives, and has been personally involved in creating the market for disposable paint cups. Davis states in her report that "it is usual and customary for experts to consider and/or rely upon sources of information such as those

identified above [Howcroft]." (Davis Rep. at 3); *McCormick, Law of Evid.* § 15 (6th ed.) ("If the expert vouches that statements are the type of data which she would ordinarily rely on in the practice of her profession, they should be a sufficient basis for her professional opinion on the stand."). Further, a 3M document from just before the damages period in this case calculated 3M's market share for the PPS product at 95 percent, DeVilbiss's product at 4 percent, and SATA's at less than 1 percent. (2007 AAD Marketing Plans PPS at 9, Paul Decl. Ex. 35.) This information is consistent with the statements of both Howcroft and Ronald Gerson. This information also suggests that Howcroft's estimations of the disposable paint cup market are reasonable as far as 3M is aware. Davis can permissibly rely on 3M's documents and employee statements, and the Court finds her opinion on market share admissible as a basis for her calculations.

### 3.     Marketing Capability and Lost Profits

A patentee must prove it had the capacity both to manufacture and market the additional products in order to ensure the sale. *Panduit*, 575 F.2d at 1156 ("a patent owner must prove . . . his manufacturing and marketing capability to exploit  . . . demand."). Further, the Federal Circuit has held that a patentee is only entitled to lost profits for those additional sales it would have been capable of making absent infringement. *Id.*

Davis' opinion on 3M's manufacturing capability is admissible because it is based on her conversations with 3M employees, after which she states it was apparent to her that 3M had the appropriate manufacturing capability, and conducted marketing directed

to Gerson customers who would otherwise use the PPS product.  Davis thus had reliable facts from which to draw her conclusions, even if the facts were derived from interested parties.  Additionally, Davis has extensive experience evaluating data from client companies in patent infringement cases, thus her methodology in relying on information provided from companies does not undermine her analysis.  Instead, such experience suggests that she can differentiate valid data from overly biased data. The Court finds Davis' opinion regarding 3M's manufacturing and marketing capability admissible as it is based on sufficient data collected from 3M employees and Davis' own experience evaluating such data.

"To recover lost profits damages for patent infringement, a patentee 'must show that it would have received the additional profits 'but for' the infringement.'" *Ferguson Beauregard/Logic Controls Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1346 (Fed. Cir. 2003) (quoting *King Instrs. Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995)).  In *Ferguson*, the Federal Circuit held that the district court failed to distinguish the allocation of profits that would have been made "but for" the infringement of the disputed patent, with the profits that could be allocated to customer demand related to the features of a **different** patent also embodied by the same device.  *Id.*  The Court finds that *Ferguson* allocation is unnecessary because the '111 Patent is a method patent which covers the use of, among other things, the PPS product.  Davis' testimony is thus not inadmissible on these grounds.

Gerson also argues that Davis' testimony should be excluded because it did not account for price elasticity of the PPS product in the "but for "world.  (Def.'s Mot. to

Exclude Davis at 30.)  Gerson says that because Davis did not account for price elasticity in computing lost profits, her methodology and principles are unreliable and her analysis is not based on credible economic evidence.  (*Id.*)

Davis' calculation of the lost profits experienced by 3M due to Gerson's sales of allegedly infringing GPS products included the following elements:

- An understanding that every sale of the GPS product has or will lead to an infringing use of the GPS product in the United States, thus all sales of the GPS product are subject to lost profits

- Some sales of GPS products occur outside the United States

- Gerson sells GPS kits that include products not alleged to be infringing, which were not included in the lost profits analysis

- Certain 3M products have been identified as likely to have been purchased if Gerson were not engaging in infringing activity

- Market share calculations were employed

- Regarding product pricing, that 3M would have made the "but for" sales at the same average price at which it actually sold its own PP products, and that the selling price of Gerson's products is generally less than the corresponding 3M product.

(Davis Rep. 12-15.)  Davis also identifies a variety of other factors that went into her calculations.

Gerson seeks to exclude Davis' testimony because she allegedly used 3M's relatively higher sales price without determining the price elasticity.  This reasoning is not persuasive.  Davis accounted for the price differences, but also noted that "[e]ven at 3M's prices . . . the end user enjoys considerable cost savings compared to using the old paint systems."  (Davis Rep. at 15.)  Thus, the Court denies Gerson's motion, and finds

that Davis' opinion is the product of a reliable methodology because she took into account the differences that Gerson argues undermine her analysis, including an extensive set of factors potentially affecting the profits 3M allegedly lost.

## ORDER

Based on the foregoing, all the records, files, and documents pertaining thereto, **IT IS HEREBY ORDERED** that:

1. Defendants Louis M. Gerson Co., Inc. and Gerson Professional Products, Inc.'s Motion to Exclude the Testimony of Plaintiffs' Expert Christopher A. Lampe [Docket No. 81] is **GRANTED IN PART and DENIED IN PART** as follows:

    a. The motion is **GRANTED** as to Lampe's explanations of patent law and discussion of awards 3M has received;

    b. The motion is **DENIED** in all other respects.

2. Defendants Louis M. Gerson Co., Inc. and Gerson Professional Products, Inc.'s Motion to Exclude the Testimony of Plaintiffs' Expert Arthur G. Erdman [Docket No. 83] is **GRANTED IN PART and DENIED IN PART** as follows:

    a. The motion is **GRANTED** as to Erdman's doctrine of equivalents analysis and discussion of awards 3M has received.

    b. The motion is **DENIED** in all other respects.

3.    Defendants Louis M. Gerson Co., Inc. and Gerson Professional Products, Inc.'s Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Julie L. Davis [Docket No. 79] is **DENIED**.


DATED:  March 31, 2011                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                          United States District Judge